The next matter for argument is Golden and Locke v. NJIT. Ms. Townsend. Good morning, Your Honors. Katie Townsend on behalf of Plaintiffs Appellants Daniel Golden and Tracy Locke. May it please the court, I'd like to reserve two minutes of my time for rebuttal. The question before you is one purely of state substantive law and though it's a narrow question, it is one of vital importance to journalists and to citizens of the state of New Jersey. Is a journalist a prevailing party for purposes of the mandatory fee shifting provision of the Open Public Records Act or OPRA? Where one, he has denied access to the records of a government agency that are not exempt from disclosure under OPRA and the agency subsequently releases those records only in response to a lawsuit filed by the journalist. New Jersey law compels an affirmative answer to that question and the decision of the district court below, which reached a conclusion untethered to the language and the purpose of OPRA and is inconsistent with the way a New Jersey appellate court would have addressed the issue, should be reversed on the merits. Here's what I don't understand about the position that you've just stated, right? So you say the production only happened after the lawsuit, but actually there was some production before the lawsuit, right? So we start with that. Yes? Well, there were 540 pages of responsive record. Sure. So there were approximately 4000 pages of records initially identified by NJT as responsive. Approximately 3500 of those were withheld and it was only after the litigation that those records were actually processed and released to my client. So when we talk about the purpose of OPRA, right, it's to make sure that state government agencies either do not become an impediment to access to government records or their recalcitrance leads to, you know, a drip drip of requested documents. So my question is this, what do we do in an instance? How do we think about this when the state government agency is not in control of the documents? Now, I know the easy answer is, well, they can claim an exemption and then if they claim an exemption, we can litigate about whether the exemption applies or we can figure it out. And there'll be questions for NJIT on that, but just put that aside for a moment. What happens when there's a third party that's controlling the disclosure of these documents and how should that play into our analysis? I think as an initial matter, Your Honor, I would respond by saying that in fact, while you say the easy answer is that the government agency could assert exemptions that it believes applies, that's what happens? Isn't the easy answer that the state agency was in control of these documents, that is that the custodian of documents of the state agency had them, notwithstanding the role that the FBI had here, whatever that was? That's exactly right, Your Honor. OPRA statutory scheme places non-delegable statutory duties on the custodian of records to, and I want to be clear, we've never taken the... It's the KL case too, right? Exactly. The KL case, which we've cited in our briefs, demonstrates that if there is a third party interest and we've never taken the position that NJIT was prohibited from consulting with the FBI or notifying the FBI... The custodian were in a tough position here, right? They were left having to deal with the FBI and the FBI's interests in these documents and emails and so forth, whatever that interest was. And I think that the OPRA statutory scheme assumes that it puts the onus on the custodian of records to answer tough questions. I think we've cited cases in our briefing, KL being one of them, that there may be third party interests. There are models that NJIT could have followed. We cite to federal FOIA's Exemption 4 and the process that's used by federal agencies... Well, and you also cite to requests that were made to other universities where there was compliance that would have satisfied you, right? That's exactly right, Your Honor. Unlike what occurred here, which did not satisfy. That's precisely right, Your Honor. And I think particularly after the state court litigation was filed, NJIT requested and plaintiffs allowed an extension of time for them to respond in order precisely to give the FBI an opportunity, if it so chose, to intervene in the litigation. It did not intervene. I think at that point, the records should have been released. Okay. But let me ask you this point. If Mason says you can't strictly rely on merely the initiation of the lawsuit and it would appear from the facts that we have that there was a pretty consistent dialogue among the parties, you, the NJIT, and the FBI, in whatever order that happened, then, you know, how does this fall within the catalyst? And I think Mason, as well as SpectraServe and Stop and Shop, these cases were distinguishable on the facts and actually support our position because in each of those cases, the agency was in the process prior to litigation of responding to the requests of making the documents available. That was happening here. Your Honor, with all due respect, that is not what happened here. My client was denied access. He received denial letters. Both of my clients received denial letters saying, we are rejecting, we are denying your request. They cited OPRA exemptions that NJIT at the time stated applied and permitted them to withhold the records, exemptions that did not apply. My client had a binary choice. The choice was go away and abandon your OPRA request or hire a lawyer, find a lawyer, and litigate. And that's, they chose the latter. They were successful in doing that. Can I ask, why didn't you just file a FOIA request? At the time, so putting ourselves back in the position that my client was in. He had submitted an OPRA request. That OPRA request was ripe for litigation. OPRA is a much quicker process than the federal FOIA process. Had my client been required after, and just to be clear. And isn't the legal answer here that statutorily there's no exclusivity to either? He could have done either. He could have done both. He elected to pursue his OPRA request, particularly because once we were in litigation, it would have been very time consuming for my client to go back to file a FOIA request, to potentially litigate that request, to wait for those records to be processed. Records that we understood at the time had already been reviewed and processed. But let's get back to, and maybe I'm oversimplifying, but it seems to me that the root of all this, the central issue of all of this is what Judge Greenaway referred to a few moments ago. And that's the application of the catalyst theory. The factual causal nexus here. Explain your theory of that, factually and legally here, please. There are two prongs to the catalyst theory. As you mentioned, Chief Judge Smith, only the first prong is at issue, the factual causal nexus between the litigation and the relief that the plaintiff sought. Here, the relief plaintiff sought were the release of records that were previously withheld, non-exempt records. Again, this is not a case about exemptions. This is only about attorney's fees. I think what distinguishes this in the most salient, sort of easiest way to say it is that absent my clients filing a lawsuit, NJIT would not have released those records to my client. That is what distinguishes this case from Mason, from SpectraServe, from Stop and Shop. All the cases where the courts in New Jersey have held that the catalyst theory was not satisfied, it's because the litigation actually wasn't the catalyst for the release of the records. Here, there's no dispute that had my client not filed a lawsuit, those records would not have been released by NJIT. And I think that is the answer. It may sound simplistic, it may sound straightforward, but I think that's precisely what the New Jersey legislature intended when it made its fee provision mandatory. You may be right about that legislative intent, but there is a piece of Mason that gives me pause, and ought to give you pause as well. Because it does seem to introduce a reasonableness component. There's reasonableness language in Mason, and it's language upon which I think both the magistrate judge and the district court here relied. Doesn't that undermine your position? I think it doesn't when it's read in context. Certainly, the New Jersey Supreme Court in Mason did refer to reasonableness, but it has to be read, one, in the context of the facts of that case. The Mason court was talking about the reasonableness of the efforts on behalf of the agency to comply. And it also has to be read within the context of OPRA itself, the statutory structure. OPRA does not restrict fee shifting to instances where the agency acted reasonably. It provides for fee shifting in all cases. There's a separate provision of the act that allows for civil penalties. What's unreasonable about NJIT's actions when they are acting at the behest or directive of the FBI? Well, I think as a matter of law, I would say it's unreasonable for the New Jersey Institute of Technology to withhold records that are not exempt, not exempt under OPRA, on the basis of asserted OPRA exemptions. Withdrawn by the FBI? That's unreasonable? Unless you're asserting some degree of subterfuge, why isn't it reasonable for a state agency to rely on a directive from a law enforcement agency? Is that inherently unreasonable? Should we say, because we're always thinking about rules, and I know I'm focused on what's the rule that is going to emanate from this case? And it sounds like the rule is, unless you invoke, unless you specifically invoke an exemption and there is, if there's some conflict, some judicial ruling on that exemption, it's essentially a strict liability. The state agency has to turn it over, and if anything comes up in the interim, it's kind of too bad. I mean, that's what I'm getting from this. Well, I think the statutory scheme suggests that if there's not an exemption that applies, then yes, the agency needs to turn that record over. Now, agencies do sometimes assert exemptions that courts later ruled do not apply. In this case, the agency asserted OPRA exemptions and then abandoned those exemptions once a lawsuit was filed because it acknowledged that those exemptions didn't apply. And so I think that can't be conduct that any court would want to encourage an agency to adopt or to follow. Your argument is, notwithstanding the protestation that, hey, our hands were tied, we couldn't do anything, the NJIT actually asserted OPRA violations and some other things on its own, which created a problem. It did that pre-litigation, and then once my client filed a lawsuit to challenge those exemption assertions, to get precisely the ruling that Chief Judge Smith was referring to, a ruling that said these exemptions don't apply, that is when NJIT sued the FBI for indemnification and turned what was a straightforward OPRA lawsuit, I think, into a quite protracted litigation over attorney's fees in the federal court. Let me ask you, how about the Gannett case in New Jersey? I mean, it seems to be somewhat similar to this situation. Why wouldn't that apply, and how does that not go against you? I see that my time is up. May I respond? I think the Gannett case is distinguishable for a couple of key reasons. I think the court in Gannett was concerned that in that case, a federal law enforcement agency, the U.S. Attorney's Office in New Jersey, had not been notified that the request was made or pending and had not been notified of the litigation. So it had not been given an opportunity. I think that's what Gannett stands for, the concept that if there's a third party, and it may not be limited to a government agency, but if there's a federal law enforcement agency that may have an interest in the documents, they should be given notice and an opportunity, if they so choose, to intervene in the case, to assert exemptions, to potentially consult with the agency pre-litigation. All of those things happened here, so I don't think Gannett really speaks to what occurred. In this case, the FBI certainly, it seemed consulted with NJIT prior to litigation. NJIT applied, according to the certification of its custodian of records, applied exemptions to withhold records. My client sued. FBI was given an opportunity to intervene. It declined that opportunity, which I think is an important point. It declined the opportunity to intervene. It became a part of this lawsuit only by virtue of the third party complaint. Let me ask you a follow-up question. With Gannett in mind, and this is more hypothetical, if NJIT right out of the box said, our hands are tied, the FBI has told us they've got to do their own review and we can't do anything, what would your position be here? That they'd still be on the hook, just because they're a custodian? I think we would be in a different situation had, I mean, there is no dispute. I want to be clear, there's no dispute that these are records subject to OPRS. So these are records that, under the statute, meet the statutory definition. I think if we played that out and we attempted to move NJIT off of that position, if we ultimately filed a lawsuit, I think NJIT would be in the position of arguing that these records aren't subject. What would your position be if they immediately said, I mean, I know this is thousands of documents, let's say it's five documents, okay, and they said, hey, this is, FBI told us we can't do anything. What would your position be there? My position would be, are you asserting an exemption to disclosure under OPRA? The mere FBI didn't told me not to is, with all due respect to NJIT, not an exemption under OPRA. Now, if they asserted OPRA exemptions, I think we would take the same position, that we're entitled to challenge those exemptions through litigation, in state court, under state law, under OPRA. We may win, we may lose, but if we win, we're entitled to attorney's fees. That would be our position. Okay, so I just want to go back to the district court ruling. The RNR and the district court analyzed the situation in the same way, and that is that the position of NJIT did not change throughout. The position of NJIT was that NJIT was not recalcitrant in wanting to produce, but their hands were tied. Is that at all a relevant consideration? And I say it in the context of thinking about the catalyst theory, right, because we've talked about Mason, we've talked about your position that we started the lawsuit and then all of a sudden things happened. But those two courts took that position that NJIT was the same throughout. What role should that play in our thinking now? I have two responses to that. One, Your Honor, I think it's important to recognize in the most recent appellate division decision in North Jersey Media Group against Passaic County Prosecutor's Office emphasizes this. It does not matter if the agency was relying on a reasonable interpretation of Oprah, whether it was acting in good faith, whether it was faced with conflicting decisions. This is a policy choice, and this is a policy choice that was made by the New Jersey legislature. In cases like this, where litigation is necessary to compel the disclosure of records, they're not getting released any other way, litigation is necessary, then the agency, the public agency, even if it's in a tough spot and has to make a tough decision, and even if it interprets the statute reasonably but is wrong, it has to bear the cost of that litigation. And there are policy implications that flow from that. This rule is designed to encourage Oprah litigation, frankly, meritorious Oprah litigation, like this one. It's intended to encourage plaintiffs like my clients, including a Pulitzer Prize winning journalist, to pursue these kind of records. It's intended to encourage attorneys like myself and my local counsel, Mr. Rosen, who took this case on pro bono, to take these cases pro bono and to pursue them with some assurance that if it is, in fact, a meritorious case, as we believed it is, we're going to be able to recover at least some portion of the resources that we've expended to litigate this case. Thank you. I just had one other thing, and we're with the profession of the chief. Yes, I have a matter as well. Does this case bring up supremacy issues? I mean, what if we had a state that had an Open Records Act that basically had no exemptions, and there were FBI records? FBI said, hey, we don't have to turn this over under our FOIA. Does this case implicate supremacy concerns? This case does not implicate, I would say, any supremacy concerns. Both federal FOIA and state law is harmonious. That's particularly true with respect to OPRA because OPRA has provisions, and even the Gannett case suggests, in fact, that at least certain FOIA exemptions are incorporated into OPRA. So in that sense, there's no conflict at all between the state law and the federal law. And in fact, we were limited to state law because we sought state records from a state government entity. We couldn't have used FOIA to do that. So I don't think there's any supremacy considerations, at least not under the facts of this case. One matter that there seems to involve some disagreement in the briefs between you and the other side is the standard of review. Just to make sure I understand your position, a determination as to prevailing party, as far as you're concerned, is subject to plenary review, right? That's correct, Your Honor. Thank you. We'll have you back on rebuttal because I'm going to inquire of Mr. Potters on that standard of review question as well. Good morning. May it please the Court. My name is Gary Potters, Potters and Della Pietra. On behalf of the defendants, appellees, New Jersey Institute of Technology, and Clara Williams, the records custodian. Your Honors, I had a really well-drafted script that I'm going to put aside and I'm going to make my argument based on the questions that were presented to appellants' counsel. Standard review, legal questions, plenary on facts is not. There is some deference that is accorded to both the decision of Magistrate Wetry and the independent review that was conducted by District Court Orleo. I'll work backwards, although there are some salient points that I think I need to hit up front. To the extent that you're correct about some deference being shown, do you agree that the question, the legal question of who is a prevailing party, or if it's a legal question, is subject to plenary review by this Court? Yes. All right. The requesters here did not have a binary choice, as suggested by appellants' counsel. The way it was presented is that the requesters simply either could have pursued the records from NJIT through litigation or do nothing. There was most certainly an option available to them, and that option does invoke issues of supremacy. Although I'm not prepared to discuss supremacy, I am prepared to state that NJIT's position out of the box in response to your question, I believe hypothetically Judge Chigoris, NJIT took the position at the inception that these records were federal records and they were subject to FOIA. And included in the first response by NJIT was the May 27, 2015 letter from the FBI to NJIT. Of course, we don't have that question to resolve now because NJIT determined apparently that that was not the appropriate response to take, right? That FOIA ruled here, that FOIA was governed, governed this request. The answer's a little convoluted, but stay with me and I'll get there. My answer will be a bit convoluted. That's why the underlying facts matter in terms of – It's a weak opening, but it'll be a strong finish, Your Honor. Good response. At the inception of the matter – and this actually goes to the point that Appellant's counsel made about the court should take some type of notice that the FBI didn't intervene. The underlying facts here that are undisputed matter. The FBI – Let me stop you right there. You use a term that caught my eye very quickly when I read the briefs. Stipulated facts. Stipulated by whom? Stipulated by those parties that participated in that process. You and the FBI. Correct. The requester had no involvement in that whatsoever. It's pretty misleading, isn't it, counsel? I would – Pretty misleading. I would respectfully disagree. Certainly not the kind of stipulation that I have understood in my 40-some years in the law. It certainly wasn't stipulated to by your adversary across the way here. Right? It also wasn't objected to by my adversary, number one, and number two, nor could the – The battle you want, man. Yeah. Can you just concede to what you get on? Right. Respectfully, let me drill down on it, though, because it does matter. There are numerous ECF filings on this very issue, and the origin of the stipulated facts matters. At the time that the requester concluded that they were satisfied with the production, the only issue left before the federal magistrate at the time was whether the fee application would be filed, number one, against both the FBI and NJIT, and number two, whether that fee application would be filed before the magistrate or the matter would be remanded to state court. At that time, in the ECF filings, NJIT requested the opportunity to conduct discovery. NJIT requested the opportunity to conduct discovery to elucidate those very facts, and those very facts do matter in terms of NJIT's hands being tied. The discovery of the facts matter does not resolve the question I asked, and as Judge Greenaway suggested impliedly a few minutes ago, you're wasting your own valuable time. Let me move on then beyond the facts. The FBI did not – Let's focus on the following. Here's what I understand. You asserted exemptions at the beginning of the process right after you had the exchange that you provided in the record with the FBI on May 27th, May 29th. Why did you abandon the exemptions? NJIT never abandoned the exemptions, number one, and number two – But were they asserted after the litigation began? They were asserted after the litigation began, and that issue was never adjudicated. In what way? They were never abandoned. They were always part and parcel of the position of NJIT before the magistrate. And Magistrate Wettre – Where's the ruling on them? There was no ruling on the exemptions because the application for the fees was predicated upon the ultimate satisfaction of the requester with the documents that were produced. What was – what is the mechanism in which we can look at the record and conclude that you invoked any one of presumably several appropriate exemptions? And persisted in that invocation. To be intellectually honest, there is no, quote, appropriate, quote, that applies for a state agency where authority over those records is asserted by the federal government. There is no exemption directly on point. The closest exemption that applies is Executive Order 26. Which it did not invoke, yes? It was invoked. That was invoked. How was it invoked? The problem – it was invoked in the NJIT response to the first request and reiterated in all of NJIT's responses. The problem – We're going to have a problem. A very direct question. After the litigation began, what is the formal way in which myself and my colleagues can look at the record and see that you asserted or invoked an exemption? If the answer is no, that's fine. It's not in the record because there was no abandonment because it never got further. Once the FBI was impleted, the matter was stayed. So there was never any analysis or briefing or submissions on any of the exemptions asserted. Very quickly, once the FBI was impled, Magistrate Wetry entered a stay order. So the direct answer is it's not in the record, but it was never abandoned. With limited time remaining, I want to address SpectraSERB because that goes to the issue of the admonition by Chief Justice Rabner and Mason that New Jersey is not adopting a rebuttable presumption on the prevailing party getting attorney's fees. And SpectraSERB elucidates that. And it talks about whether or not the conduct of the nonproducer was changed as a result of litigation. Here, as found by Magistrate Wetry and affirmed by Judge Orleo, the position of NGIT never changed. It never changed. So the binary choice in terms of the failure to issue the FOIA request, the change occurred by the de facto custodian of the records, the FBI, not NGIT. How is the FBI a de facto custodian? There was a designated, explicitly empowered custodian with NGIT, right? Her responsibility directly went to state records. Please explain how the FBI becomes a de facto custodian and tell me what that animal is. This is where the facts as presented in both my certification and the documents signed by the FBI and myself, the stipulated facts matter because it establishes without any doubt that once the FBI came in, NGIT was excluded from the process, 100% excluded from the process. This is even prior to my involvement in the case. The FBI conducted two reviews of the documents, of the assembled documents at NGIT. The conference room door was literally shut. NGIT was excluded from the review. The redactions were made by the FBI. The direction to withhold was made by the FBI. After the litigation commenced, the FBI asked that I reassemble the documents. I reassembled the documents. They were produced in my office to the FBI representative in my certification, not the stipulated facts. So I beg your pardon because I'm going to interrupt you because you keep focusing on facts that I'm not sure are at the core of the issues that we have to deal with. Now, you've already admitted that you haven't invoked, after the litigation began, an exemption, right? So all of these recitations to us about what the FBI did to you or what they didn't do are frankly not relevant. And whether you meant to produce or you were out of the loop, the statute, right, OPRA, provides a way for you to essentially take yourself, the NGIT entity, out of harm's way, if you will, right? And that is by asserting an exemption. So you were before a court in the state court. You were before a court in the federal court. There was an opportunity in both instances to assert an exemption. That wasn't done. In the absence of that, how can we as a court grant you any relief? Respectfully, Judge Greenaway, under the OPRA statute, there is no applicable exemption for NGIT to have asserted under the facts here. Okay, beautiful, beautiful, wonderful. Okay, let's start with that. If there is no exemption, right, I think you could, you know, assert a visceral problem with production. But if the statute doesn't contemplate an instance where an exemption may be invoked, then isn't the only thing left production? Respectfully, no. Precisely because NGIT was directed by the FBI to not produce. NGIT invited the FBI into these discussions, did it not? It did based on the monikers on the documents that said these are FBI documents. They shall not be produced absent permission lest you confront fines, imprisonment, et cetera. So the NGIT, like all public universities, has a direct relationship with the FBI in the post-9-11 world where they're in communication almost on a daily basis with regard to visa issues, immigration issues, student issues, confronted with the monikers on those documents. That's exactly what NGIT did. In response to your adversary's slippery slope argument, and what I mean by that specifically is, okay, NGIT has, in your view, a righteous position here. It's the FBI. What prevents state agencies in the future from saying, we're the middle man. We're really sorry. We really want to produce these. But this agency, whether federal or another state agency or a private party, say we can't. Now, we'd really like to do an exemption, but we don't think any really kind of fits. But trust us, we would do this. Now, that would seem to be a slippery slope that we don't want to go down, and there's no reason to go down. So why should we? I think there's two answers to that. First, I think that when one looks at Chief Justice Ravner's decision in Mason, that provides this court with a basis to affirm the decisions below. No rebuttable presumption that just because a suit was filed, one is a prevailing party. Two, the more complicated answer, and this speaks to the dicta in GANET, in GANET rather, in terms of what do we do where the entity upon whom the request is served is not the entity asserting confidentiality in the documents. It truly is a case of first impression. There's no other FOIA case or requester case under state requester laws in the entire United States that has dealt with this issue. And I think the answer to your question is it matters based on who that agency is. If it's the Sussex County Parks Authority, I think it would be unreasonable for NJIT to say, we defer to the Sussex County Park Authority in withholding documents. But when the documents are created by the FBI, they bear an FBI moniker that you confront exposure for producing without their consent when they tell you don't produce them, when they file a counterclaim against you seeking injunctive relief to prevent NJIT from doing exactly what requester wanted us to do. That argument only works if you assert an exemption, because in the absence of an exemption, those two agencies, though one larger and more mythical, et cetera, than the other, really stand in the same stead legally. You're 100% right. I think the problem is there's no exemption under the state OPRA statute applicable for a federal agency asserting confidentiality. And that's exactly what the dicta in Gannett was speaking to. What do we do in that instance? Last point I want to make. Before you get to your last point, you've made much in your briefs, and there was a question about this when Ms. Townsend was at the podium, of Golden's failure, and I think that's the word you used, to file a FOIA request. You would concede, would you not, that Golden was not under any kind of legal obligation here to follow FOIA? I will concede that Mr. Golden was not under a legal obligation, however, was not under legal obligation to assert a FOIA request, however, once he received the May 27, 2015 letter from the FBI directed to NJIT, that NJIT included in its response to the first FOIA request, Mr. Golden certainly had available to him that opportunity. And, in fact, I think it was incumbent upon him because he knew at that time these were federal records. And lest there be any doubt on that, when we appeared on the return date on the first order to show clause. You've answered my question by conceding that there was no legal obligation. Just really quickly, assume we don't agree with you. Assume there's going to be attorney's fees. I'm just curious what happens next. I mean, the FBI is still part of the case. Somebody's got to pay. Then you and the FBI duke it out, I guess, as to who's covering that? It gets even more complicated because under the applicable statute, the jurisdictional limit of the District Court of New Jersey is up to $10,000. You say it's a Tucker Act problem. Exactly. We would need to go to the Federal Court of Claims. And that claim is still pending. If I may take 30 seconds just to address K.L. versus Eve Schaum, because that was raised very quickly. It's completely distinguishable from the facts here. One, the consultation was with a parent of a minor, as opposed to the consultation here by NJIT with the FBI, the world's premier law enforcement organization. One, the entity with whom there was consultation, the parent in Eve Schaum did not direct the non-production. The public body in Eve Schaum took it upon itself to withhold from production based on the confidentiality associated with records. And ultimately, that other entity, the parent, consented. Here, the FBI's position ultimately, after it filed its counterclaim in joining NJIT from doing exactly what was sought, was done unilaterally without NJIT's involvement.  Thank you, Your Honors. We'll have Ms. Townsend back in rebuttal. Just to respond briefly, the point that was raised about the stipulated facts, we did not stipulate to them. We, in fact, did object to them. As Magistrate Judge Wetterer actually noted in her report and recommendation, she was relying only for limited purposes in light of our objection to those facts, which are inconsistent in many respects with the actual record below. I think to respond to NJIT's counsel and Judge Greenaway's point regarding the assertion of exemptions and whether those exemptions were abandoned, I think it's worth noting that NJIT at no point, though it stands here today and says these are federal records and plaintiff knew these were federal records. In fact, NJIT, when it received the first request from Mr. Golden, released some records with redactions, withheld the vast majority of those records asserting OPRA exemptions and included in there a letter from the FBI. At that point, I think, and when they responded to the order to show cause in the state court, they conceded that they were government records, agency records subject to OPRA and that NJIT was the custodian of those records. So there was no argument and there was never any motion to dismiss, for example, on the part of NJIT to suggest that this was not a proper OPRA lawsuit, that this was not a proper OPRA request, and the exemptions, no exemptions were ever asserted or litigated to withhold any of those records. They weren't asserted? They were asserted initially, but they were abandoned after the FBI became, removed to federal court, became a party to the litigation. Very shortly thereafter, the FBI informed the district court and the parties that they were going to When you say abandoned, do you mean abandoned intentionally? I mean, they said we abandoned them or it was just neglected? They released the records. And so to me, that's an abandonment of an exemption. If a document needs to be withheld under an exemption, it's going to be withheld, and the government agency that's withholding it is going to argue to the court that they're entitled to withhold it. We were fully prepared to brief exemptions. We never had to because the parties voluntarily turned those over once litigation began. May I have one question on exemptions? So on the exemptions specifically, so we've got the May 29th letter, and I presume in response to your two additional requests in July and August of 2015, there was another response because they said, you know, we're not going to turn them over. In that response, was there a reference to invoking exemptions or was only in that initial response? In all three letters, response letters, Your Honor. From NJIT. Correct. They invoked the exemptions. Correct. Once the litigation began, your reference to abandonment as such is there was no either oral representation to the court or written correspondence invoking the exemptions. Is that right? That's correct. So once the case was removed to federal court by the FBI, the FBI shortly thereafter filed its counterclaim against NJIT, and very shortly thereafter, I would say within 10 days, informed both the parties in the court that the FBI was going to treat this as a consult to NJIT, review the records, and provide them to NJIT with their recommendations for withholdings. The exemptions were not litigated. Correct, Your Honor. That's absolutely correct. Thank you. Thank you very much, counsel. This is a very interesting case. We'll take it under advisement.